Our next case of the afternoon is Russell v. United Security Life and Health Insurance Company 410-0724 for the appellant Mr. Stocks, for the appellate Mr. Ellis and Mr. Tye. You may proceed. Thank you, Marcus. May it please the court, counsel. We are here today seeking the reversal of a judgment for a breach of contract claim against United Security Life and Health. And our first two points are, did we even have a contract to begin with? And secondly, for an estoppel to apply, as is the counterposition in this case, must at least the insured have intended the application to be his application. I believe that's our beginning fact in this case. Kenneth Russell never intended the application, which is the subject of the controversy, to actually have been his application. Which begs the question, did we ever have contract formation with respect to Kenneth Russell and United Security Life and Health for the issuance of a health insurance policy? What happens is, after an application is forwarded to USL&H, they send a typical correspondence that they would, advising their potential insurers, which in this case would not only have included possibly Kenneth Russell from the USL&H perspective, but the other members of the family. Telling them, read the policy. Did his wife intend the original application to be an application? For her, yes, and for family members. But we have a judicial admission in this case, in a verified pleading, where Kenneth Russell stated, I did not intend the application to be mine. It included my wife's information, which in relevant part included her prior kidney stone history, but I did not include it at all. The insurance agent comes and talks to the two of them, takes down information, she signs a form, the insurance policy arrives, and you say the insurance policy only covered her? It only bound those that intended to be applicants for the health insurance at that time. That is a fundamental element of contract formation, is the potential insurer is making an offer to the insurer for coverage. And in this case, because the application, we had a fact dispute whether Kenneth Russell, and that is the claim that is the operative claim in this case, whether he ever executed that application. But he does confirm in a verified pleading that he did not intend the application, the original application, to be his. Now, USL&H gets it and assumes it is a family application. Sends it back with, they had done, the only underwriting available to them at that time, they had done an index bureau check on the family members, which included Kenneth Russell. And it identified a Vioxx and arthritis history so that they sent an amendment to the application back. In their briefs, the appellee, or Kenneth Russell, takes the position that it was the letters from United Security, the independent communications between potential insurer and insurer, communications that the producer was not part of. They considered that to be the offer from United Security to Kenneth Russell. Well, in that offer was the express directive from USL&H and independent communications, which we believe is the dispositive distinction in this case compared to others, told Kenneth Russell, read the policy and the application attached to verify and confirm its completeness, and had an amendment to application that had an additional history, the only one USL&H knew at that time. Kenneth Russell says, I accept your offer to be insured. And I believe this is cart ahead of the horse in the way that this is unfolding. And I believe it's developed that way in this case because we initially had a judicial admission that Kenneth Russell had executed the first application as his. They wanted to get out of that admission and said it was a mistake and filed another verified pleading saying, no, we only intended the initial and original application to be on behalf of Mrs. Russell and the children. And went on to say in the testimony at trial is that Kenneth Russell was concerned as to whether he would have too many writers if his entire prior medical history was known. Our fact dispute, which I submit is not material to the disposition of our appeal or securing our reversal, is Tom Bickle, the producer, says Kenneth Russell never told me this prior history. Kenneth Russell says, yes, I did. You put it on a side sheet of paper. But I didn't intend it to go on the application yet. This was not my application. But the trial judge resolved all these questions. He didn't resolve that question. He said he doesn't believe Bickle and he believed him. Well, let's assume it's true. That's why I say it's not material. Because the court still made a ruling against the manifest way because he is attempting to override a judicial admission with evidence that really wasn't material to the point. The judicial admission was this original application was not intended to be my application. What about the amendment and then signing that and then having Dial, the compliance officer, say, yeah, once he signed that, that was a precondition to our contract with him. And once he signed it and we signed the policy, he was insured.  Isn't that the testimony? That is testimony, but it does not, you know, Dial, based on what he knew, you would not have had a meeting of the minds. Because from USL&H perspective, they thought the original application was Kenneth Russell's. When Kenneth Russell ratifies that after the subsequent communication, he has then ratified what he knows to be a false application as his. The agent is no longer involved in that transaction. This is like the Marion Joy line of cases. What was false in the writer that he ratified? In the amendment to application, in that amendment there is, he has not added to the amendment all of the prior medical history that in the same communications he was told to review. The first app that he was ratified, he was told to review it. What specifically was false? Oh, didn't have his kidney stone history, didn't have history regarding Wellbutrin, a depression episode. But isn't that the very evidence, or most of that, the very evidence, those very facts that he contends he did convey to Bickle? And that the only reason Bickle is putting him, I mean, I understand this is all a dispute, but Bickle puts it down, and their testimony, his husband and wife's testimony, Bickle says, you know, I'll check with my supervisor on this. This is some stuff, I don't know if we need to put it in the application, I'm making separate notations of it. He denies that, but they say, no, that's what he did. But Kenneth Russell didn't intend to apply at that moment in time. Well, what about after he received the, what was it called, the second... Well, we'll call the amendment to our petition. That's right, thank you, Counsel. He receives the amendment at that point, and it was addressed to him, wasn't it? It was addressed to Kenneth Russell as well, as well as the other correspondents. Why would he not think at this point that he is now covered as well? If he thinks he's covered, he's covered because he knows that information that he did not intend to have on the first application, he knows it as a matter of fact. How do you say that he didn't intend, I mean, I understand that's your position, but he says, I gave the information to your guys' agent. He's the one that decided to put some on the application and some on another sheet. Our understanding was he was checking this stuff out. Not true. He did not, Kenneth Russell was complicit, colluded, in a sense, to use the language, not to give it the negative connotation, but to give it the language of our applicable case law, because Kenneth Russell did not intend it to go on the initial application. That was Kenneth Russell's choice, not Tom Bickle says he never told him. But here's the problem with that argument. If Bickle is clearly an agent of the company at this point, and he is, and I'm a potential insurer, and I'm sitting there telling Bickle about my history, what Bickle does with it is entirely attributable to the defendant. The idea that, well, he wrote it here and he wrote it there, as long as Kenneth tells him about it, it seems to me that the judge would be entirely correct in saying the insurance company knew, or is charitable with knowledge because their agent knew it. If Kenneth Russell did not intend that to be his initial application, I think we have a problem calling Tom Bickle an agent at that time, because Kenneth Russell has testified, hey, Mr. Bickle, I'm going to give you this stuff on the side. Go out there for me, and determine how they will react to that. Contrast that to the situation where I come out to sell you insurance and say, I want to be a buyer. I'm giving you this information as a buyer, ready, able, and willing in a transaction today. Kenneth Russell wasn't crossing that line. Again, this is sort of an odd twist of the case, is that USL&H, thanks to the guys out there, he's an independent producer, but would be chargeable, dealing with them as an applicant. But at the time of Tom Bickle's involvement in this case, Kenneth Russell did not intend to be an applicant for insurance. In fact, he says, Mr. Bickle, go out and see how they'll react to this. Well, if they react favorably... If they react favorably, then... Apparently, I'm going to get a policy, because we're paying a premium for it, and you're sending me an amendment, and I'm signing it, and I'm sending it back. And then you step into what I submit as the Marion Joy line of cases is. There was no... And as they concede in their brief, is that USL&H actually made the offer for insurance. And they sent to Kenneth Russell three things. The first policy that had application attached, that did not contain any of Mr. Russell's information, which he did not intend to be his yet. The letter telling him, read this, make sure it is all correct and accurate. And based on the only history they knew, at least USL&H, and that's the testimony, had a VIOX history on the amendment to application. In that independent communication, Kenneth Russell then says, when charged with reading all this and making sure it is accurate, says, okay. Well, the problem is, Kenneth Russell knew. And this is a distinguishing factor to the estoppel cases or the imputed knowledge cases, is that Kenneth Russell knew that in that application he did not intend to be his own. He knew that none of that information was put down. And he knew Tom Bipple wasn't going to put it down. Compare it to the Adams case, the dog case. She told him about the dog. She intended to be an applicant. And what he decided to write in pursuit of that application was that agent's choice. And there was no subsequent independent communication as we have in this case. Let me ask, this concession or admission you say that was made by Russell, that's in his brief where he says a contract was formed upon the offer and acceptance of the amended application? Yes, that and his other statement in there stating that the content of the original application, I believe the phrase is quite frankly irrelevant as to what Bipple had done. Well, before that he said, as can be seen from Ken Russell's testimony at trial, he had every intention of applying for insurance coverage with United and that when he received the amendment to the application he signed it and returned it in order to accept United's offer. It seems to me he's not confessing that he never made an application. He's saying he thought he made an application. But in any event, when he got the contract back and filled out the second rider or whatever the provision was, it clearly was a contract. He was never, what he says there is that he was never the offeror. What you just read, Kenneth Russell was never the offeror for insurance, which means in the context of how these facts went down, he was never an applicant until USL&H communicates back with him. Different and distinguishable from all these other family members. What you're trying to do here is ignore Bipple, right? You're trying to write Bipple out of the picture so anything that Russell told Bipple you aren't stuck with. That's why you say, oh, no contract until we sent him the policy, even though you thought there was a contract. The insurance company thought there was a contract when they sent him the policy. They can't have a contract without meeting of minds. And the fact of the matter is when Bipple was involved, there was no meeting of the minds. That went in. But even if, let's assume we accept everything that... So why did the insurance company send the money back? But they did. No, no. They paid several months' worth of premiums. And when they discovered that they did not have... How about that first month saying, hey, what's this check? We don't have a policy with these people. Here, it's back. They didn't know any of this at that time. Well, doesn't that suggest that maybe they thought and the record suggests there was a contract? Well, they would have thought that until we deal with litigation where they seek to avoid... We're being whipsawed here. In the first instance, they're saying they didn't sign and adopt an application that did not include the history. To get away from that, they do a judicial admission saying we did not intend this to be our application. We're laboring under... Before we learned he withheld this stuff. We think we have an initial application. And then there could be consequences to that. And now we get whipsawed and say, well, that wasn't our intention. You came back, made an offer to us. We say, gotcha. Now we're covered. When we learn upon an initiating claim for kidney stones that... And look in the very records that we're asked to pay the bills on that he had a whole history of this. And then in the proof of claim that we get for this, they even deny a prior history. So even in the processing of this claim, they continue to conceal the kidney stone history. We learn how extensive it is. We rescind and send... On the other hand, the whipsawing could have been had the Russells made no claims to this insurance company, they could have collected five years' worth of premiums. Two years they would have been... They would have had no defense. Contestability would have not... Okay, two years' worth of premiums only to be told, you know, that stuff you've been paying us, forget it. Under their underwriting, they could not have gone that long because in evidence is the underwriting code. Had they gone through the first, I believe, year of coverage, they would have picked up this kidney stone. The writer would not have extended. But they had other writers. What led to the rescission decision was the totality of multiple writers. The next step moving on, because of what we call the delayed contract formation, if you even accept that, it appears the trial court went to what I believe is an extreme interpretation of the facts to say that the kidney stone history was not material. Now, the only evidence in this case was the former underwriter of USL&H, the underwriting guide, which was an industry guide adopted by USL&H, the claims adjuster, Jim Roberts, and Robert Dial, the company that said a prior history of kidney stones would have resulted in a writer excluding it for the time that this claim was made. And there's no countervailing evidence. Well, the testimony about Bickel's representations, the trial court believed that. Well, this wouldn't deal with materiality. In fact, the testimony of Tom Bickel was that he did not know. That's what his testimony was, but the trial court didn't believe him. There was no dispute on materiality on that. Did Russell say they told him? Told him what, about the kidney stone history? Yes. Yeah, that's what they say. Well, if that were true, then isn't the company on notice? On notice does not mean you formed a contract when a man ratifies an application after the fact. It would be one thing if Kenneth Russell was intending to form that contract from the get-go, and this happened, but Kenneth Russell wasn't a contracting party at that time. And still, there were independent opportunities for Kenneth Russell. When Kenneth Russell finally decided he wanted to contract with USL&H, ready to commit, ready to have a meeting of minds, Tom Bickel's history. Tom Bickel's history at that point in time, and this is independent communication. Why shouldn't Russell, when he's filling out the second application or whatever, why shouldn't he rely on what Bickel told him, that his kidney stone history is not relevant? He never went to a doctor. He never had to have stones removed. He passed them himself. Because his wife's history for kidney stones was on the same application. Because he knew his history was not included, but most importantly, admitted by all the parties. Tom Bickel told them that he did not know what the underwriting requirements were for USL&H. And even more importantly, the whole reason this side paper was prepared was because Kenneth Russell... Bickel said he didn't know what the insurer was going to do, but then the insurer sends out the policy. Why shouldn't Russell say, oh, okay, I'm all in. Because he was told to read it and make sure it was accurate, and he had actual knowledge that it had been omitted. But he's been given a representation by the insurance agent as to what accuracy means, what needs to be included. If you assume that in the instance when Kenneth Russell is telling Tom Bickel, hey, go check what they'll do for me, as opposed to Tom Bickel out there selling a policy to him, again, I don't buy the legal conclusion that he's the agent of, under their version of this delayed contract formation at that one meeting that Bickel had. One other point that I want to make. We have no damage in this case. Go ahead and make it. $7,500 condition precedent to payment for the obligation of USL&H. There's no fact dispute. It was never paid. Who do they have to pay that to? They pay it to the providers. It's a major medical plan. They pay $7,500 to the health providers. No fact question. Never paid. Bankruptcy discharge taken before that $7,500 ever was paid. No claims were filed by the health care providers in the bankruptcy. Every penny of this recovery is un-filed. Yes. The discharge order was entered long ago. You'd have to reopen and be almost a volunteer to pay that debt. And so technically the condition precedent, there's no breach of duty if they didn't pay that. But the fact of the matter is they've never had to pay a penny more than what their contract required. And even under contract, the PPO would have only been a $19,000 payment. The contract measure would have been that. We've been hit with over a $30,000, the face amount of the bills. It's not a BI claim where we're a collateral source. This is a breach of contract action. Contract measure of damages. They had tried to fulfill mitigation and had an agreement for a $14,000 payment. We'll hear from you on revival. Thank you. Please report, counsel. My name is Chris Ellis. I'm the attorney for the plaintiff along with my co-counsel, Tim Tye, who authored these briefs. I believe that from the outset, there's no question a contract was formed here. Mr. Dial admitted the same during his testimony. I believe the findings made by the trial court are all correct and they're not arbitrary. Therefore, those findings should be affirmed. We are asking the court to affirm as to the decision as to the breach of contract in the Section 155 finding and also as to attorney fees. What we are also doing here on a cross appeal is asking this court to look at and review the findings by the court with respect to the Consumer Fraud Act and the actions of the agent, Mr. Bickle. To put it as simply and as forcefully as I can, the whole process at issue here engaged in by United, it's a sham. The facts of this case will explain why. You have an agent go to a home of a family that has insurance. That agent sells insurance to this family. At no point does the agent tell the family there's what's called a two-year contestability period. That is not on the application. That is nowhere to be found. Mr. Dial testified to that fact that agents are not trained to tell a consumer this. A consumer would have no knowledge of that information until a policy is actually received. In order to receive a policy, the consumer would have to terminate the coverage they currently have in place. What that means is that for me as an insurer who has health insurance, I get offered a better quote on insurance. I take it based on an application. I then receive a policy in the mail. I've already canceled my other insurance. If I read the policy, I learn for the first time any claim made by me in the first two years is open to contestability and can be looked at by the insurance company. Contestability for what? For any reason at all, according to Mr. Dial. How is that different from any insurance policy where the insurance company is going to say a claim has been made? Was this something appropriately revealed during the application process? Your Honor, I think that the issue is whether that information should be conveyed to the consumer. You mean the consumers are going to know that otherwise? Yes. For instance, if you have a preexisting condition and you don't tell the insurance company that, the insurer won't know that maybe the insurance company is going to be checking that out? Well, I think here, under these facts in particular, you've got an insurer who has told all that information to an agent. So you already have the information being conveyed to the insurance company. You seem to be asserting in your claim for punitive damages that somehow there is an impropriety or unfairness or some bad dealing by having an insurance company who has received a claim checking to make sure that they haven't received false or misinformation in the application. Is that what you're saying? Yes, Your Honor. Where does that come from? Well, it comes from the fact that, again, this two-year period for a consumer. How is it that any insurance company routinely wouldn't be doing that? Well, don't they? The question is, should the investigation happen post-claim, after a claim is made, or when the application is made? Well, counsel, if, for instance, there's a withholding of testimony about a history of depression and mental illness, and then there's a claim for kidney stones, I don't think the insurance company is going to say, well, you didn't tell us about this condition, so we're not going to pay it. The chances are that they only are going to be checking this out once a claim has been made to see if the misrepresentation or false information is material. Isn't that what they do? You would think. And they don't know that until a claim is made. Isn't that right? That is correct. But here what they did is, once a claim was made, they actually searched for any reason to try to invalidate the policy because of this two-year period. They talked about seeking a consultation for weight loss, seeking a prescription for a weight loss drug that the insured never took, a prescription of Prozac for one month that he stopped taking, back pain, and used these issues to rescind the policy based on a claim for kidney stones. This is premised upon the fact that they're bad for looking. They're bad for not telling. Not telling whom what? Not telling the consumer who has health insurance that once you cancel that health insurance, you really don't have coverage for two years. They have coverage unless there's a misrepresentation made. And I suppose my question is this. I don't understand how this isn't a routine practice by all insurance companies all the time that everyone would understand. Your Honor, it is a routine practice. Namely, if you've made a misrepresentation to the insurance company and you're now making a claim with that misrepresentation of the material, they might say forget about it. If I can make a couple points. Go ahead. The first point would be you do something wrong one time or 20 times, it's still wrong. Is it a common practice in the industry? Yes. You mean the whole industry is composed of bad doers for doing this? I think this two-year contestability period, not disclosed to the consumer, coupled with the post-claim underwriting is unfair and deceptive. And the other point I would make on it, Your Honor, having completed one of these health care applications, which most of us, all of us have probably done, it is nearly impossible not to make at least one misrepresentation in an application that's asked you for 10 years, every doctor you saw, every drug you took, every pill you took. So if insurance companies are allowed to then sort through your records to find any reason to cancel coverage, it's unfair and deceptive. All they have to do is tell the consumer. So if I have health insurance in place, I might decide it's more important to me to keep that insurance and not have this two-year period. Because your current company isn't going to be checking out claims you make? After two years, they can't. After you have a two-year window, an insurance company cannot go back and look at your representations on an application. You mean if they were false? If they're false, you're home free. Just like life insurance, you commit suicide two years in one day, your family gets the money. One year, 360 days, you don't get the money. I think you're looking at the contestability clause in the wrong direction. Normally, with a contract, if you've made a misrepresentation, that can be raised at any time. So the legislature passes the incontestability clause. After two years, the insurance company can't complain. And you're saying, oh, the insurance company needs to tell us that in the first two years, they have the right to object to any misrepresentations we make on the application, which seems to me to be completely backwards. But if you take this case, Your Honor, it's a perfect example. How the insurance process works. Agents meet with potential insurance. They have conversations. There's a discussion, just like happened here. Hey, I took this for a month three years ago. Is that material? Nah, it's not material. Don't put it down. The agent tells, applicant doesn't put it down. Insurance is bound. You cancel your old coverage. So you went from having insurance that paid your claims and everything's good to having this two-year period where if you so much as trip and fall, they may go back and try to say you had kidney stones five years ago, you didn't put on the application, so your policy's rescinded. What's wrong with that? Like you say, you fill out an application. As I understand it, you're saying the application doesn't mean anything. Our point is this. Who is in the best position to safeguard against this issue? Is it the consumer filling out the application with the agent, or is it the carrier who could conduct the underwriting prior to issuing the policy? Many states have already ruled that post-claim underwriting is not acceptable. It violates consumer protection statutes. It violates just fundamental fairness. And here we've got both the post-claim underwriting and this two-year contestability clause. When you put it all together, you've got the Russells. They are now bankrupt because they have medical bills that weren't paid. Before this application was taken, they had health insurance. Had they been told... It seems to me, counsel, that the claim you're making is you're saying that the Russells should have been told if you have insurance now, your misrepresentations can't come back to bite you, so be careful about getting newer insurance and your new misrepresentations. I don't think it's... Because if you have no misrepresentations, either old ones or new ones, they have nothing to fear, do they? But no, again, Your Honor, the misrepresentations are what are decided later by the carrier, who here founded a misrepresentation that Kenneth Russell did not disclose. He had a consultation for a tummy tuck surgery that was never performed and used that as a basis to rescind his coverage. So the misrepresentation... That wasn't the basis. It was the... No, Your Honor. In the record, it's clear they had five bases. Well, you're right. They alleged a lot of different things, but it reminds me of lawyers that come up here and they have one good issue and they argue ten. Now, should we hold that against lawyers? Or should we say hey? It depends on how well they argue. And did some court pass upon the tummy tuck and say, that's a misrepresentation, this is no longer good? I don't think so, counsel. And the fact that you say that they raised this crapola argument doesn't demonstrate that the other stuff they raised would have been objectionable. As a matter of fact, in this case, if it had been true that Russell never revealed any history about kidney stones, then the insurance company shouldn't be liable, should they? If in this case there were misrepresentations, if that information was never conveyed... If he had said, no kidney stones. Affirmatively made that representation. Should they have to pay? I would say no, Your Honor, but I would say... But this is a troubling issue for you, counsel. I see you're kind of anxious here to have to... It is a troubling issue because of this two-year window where people cancel coverage they have. So if it's caught within two years, his misrepresentation saying, gee, I never... No kidney stones, no problem. And he's caught within two years. They're bad for catching him. Is that your position? My position is they should have done the underwriting before they issued the policy. Well, they... You mean they should have checked to see, was he lying when he applied? They should have reviewed the medical records and files they could get. But again, that... They should have read all his medical records and checked to see whether there was a positive result for kidney stones. At some point this company... Before any claim... At some point this company is going to do underwriting. Counsel, is that your position? They should have gotten a hold of his medical records, and they should have checked to see if he had kidney stones showing up there so that if he had lied about it when he applied for the policy, they could have caught him then. Well, let's talk about this case, not Broadway. No, I want to ask that. You are asking for punitive damages because of their impropriety. I want you to answer my question. In this case, yes. They absolutely should have gathered medical records. So they should have gathered their... Yes, there are three reasons why. First, in Brandt. The court in Brandt makes it clear that the carrier and the agent had undertaken no affirmative duty saying they were going to investigate the health information included in the application. Here, United, through its agent Bickel, said, I'm going to take this information you gave me on this piece of paper, I'm going to give it to the company, and we'll decide whether there's insurance. So under Brandt, they actually assumed a duty to investigate. Second, in our case, and in the Boswell case that we cite, the issue becomes whether or not... had an independent duty to conduct an investigation. As Boswell held, citing the Georgetown case and Illinois case, another Illinois appellate case, the question is once the carrier's been put on notice that something's wrong, that there's an issue with this application, at that point, rather than just sit back and issue the policy and say, well, we think this applicant's lying, but hey, we'll give them the policy anyway, and if they try to make a claim, then we'll nail them. If they don't make a claim, then we profit off it. The court said in Boswell, you have a duty at that point to do the investigation. So under our facts, Russell told Bickel everything. But that's why you should win. Buckley did an investigation. That's why you should have coverage, is what your theory is. But you want punitive damages for their inquiry. No, for their not inquiring, because what happened then, Buckley discovered in an MIB report that Kenneth Russell had arthritis. Well, let me see if I got this right. We have concerns about health costs now. Yes, sir. And you're going to tell the insurance companies, you know, when this guy, Bob Cook, applies for insurance, and he's got these 45 years of medical records, we want you to go over that and check it against his application form and make sure he hasn't lied. And do it now before you issue the policy, because if you wait until he makes a claim, that's a consumer fraud and a bad practice and will be punitive damages. Is that your position? If I may, there's a policy argument. In this case, no, that is not a policy argument. Is that your position, my hypothetical? No, Justice, not in the Russell case. Because in the Russell case, the defense actually is. No, no, no. You see, the nice thing about oral arguments is I can ask you hypotheticals and scenarios. Okay? I just asked you a scenario. Right. Is it your position, first of all, that the insurance company is going to have to go over his 45 years of records and compare it to his application to see if there are any discrepancies? It is my argument that Illinois should follow those states that it's deemed post-claim underwriting and unfair practice. Is that a yes or no, counsel? That's a yes. It's a yes? That Illinois should follow those states that it's deemed post-claim underwriting and unfair practice. So the answer is yes, they have to do that up front? That is our argument. Okay. How much do you suppose that would cost? The United said they don't gather the records for cost savings, but again, they earn the premiums from the insured for two years and then wait, and if they make a claim, then they're willing to incur the cost. What states have said that the insurance company is required to do that? Wyoming, California, Minnesota. But as to this case, as to Kenneth Russell, United had a duty to do further investigation when Buckley determined arthritis was not on the application, called the agent, and the agent for the first time said the word Vioxx. That told Buckley that these insurers, proposed insurers, must have conveyed information to our agent that's not on the application. Under Boswell, under that court's ruling, that would have extended to the carrier at that point a duty to further investigate. Had they further investigated at that time, they would have gathered, had they even called Ken Russell and Lori Russell, the proposed insurers, they would have learned of this other information that Russell had previously conveyed to Agent Bickle. I see some inconsistency in your argument. You're saying that the insurance company should have done the investigation first, but you also say they did the investigation. They sent their agent, Bickle, and he got all the information and conveyed that to the insurance company. Justice Cook, if I may, the investigation I'm talking about is the underwriting investigation. What Bickle did was just to gather information for an application. The underwriting process occurs when you take the application information and then you gather the records to determine whether it's an insurable risk. That can either happen pre-claim or post-claim. Here they'd wait until a claim was filed, then they would undertake that investigation. But under Boswell... So if Russell had told Bickle, I have no history of kidney stones, the insurance company could not have relied on that? No. You're on a guess. They absolutely could have relied on it. And if Ken Russell was lying, was misrepresenting, was doing anything wrong, then he's held liable for that. Absolutely liable. It's your theory that Bickle jabbed the insurance company. And I see it as inconsistent to say that after the insurance company has been cheated by Bickle, they should have done some investigation later on. But the question is, who is in the best position to insure against that risk? If an agent is going to take that action, is it the insured who is faced with losing insurance and going bankrupt than the average consumer, or is it the carrier who would have a direct action against both the agent and could attempt to undo the policy against the insured? The only recourse that the Russells have, based on the conduct of Bickle and United, when they together learned Bickle's testimony, that his story could not be true, is they had to lose their coverage, file bankruptcy, and sue these two parties. And what I'm suggesting to the Court is that we've talked broad policy implications, but also in this case in particular, when they had noticed that something was wrong with the application, they had a duty at that point to do more. They had a duty at that point to find out, hey, is there something else that we're missing about this? And that's what the Boswell Court held. And again, it's where can that best be fixed? And the other argument is just telling the consumer about this two-year contestability to me just makes a lot of sense and would be more fair. The other issue on our appeal is one that's perplexing to us from the trial court, and that's as to Counts 4 and 5 and the actions of the agent Bickle. Pursuant to Section 2201 of the Insurance Code, Bickle owed a duty to exercise reasonable care in procuring insurance. Included in that duty would clearly be conveying medical information to the carrier. The Court found Bickle did not convey that information. He had a duty. He breached it. The damages caused by the Russells is clear. They were forced into bankruptcy. They lost their insurance coverage and these underlying events. So based on that, we would ask that this Court reverse the trial court in its finding that Agent Bickle was not negligent and that United was not responsible for his actions. And entered a judgment against Bickle as well as against United? Yes, Justice. What difference does that make to you? Do you think United is not going to be able to pay? No, we don't suspect United won't be able to pay. And I think his conduct would then be applied to the company. Would then be what? Would then be applied to the company. Well, they already had a judgment written against them, didn't they? Yes, but that was a contract, and we're seeing support damage against Agent Bickle. Are you asking for double damages? Are you asking for double damages? Yes, for additional damages, Justice. We asked for, I believe, an award of, I think, two times the actual damages to the trial court. Just for the egregious nature of the conduct and the fact that he owed a duty, he was negligent in performing the duty. Was the guilty party here Bickle or was it United?  Well, under agency theory, there's only one judgment for damages. You don't double up the damages. No, you don't collect and provide such correctness. With no further questions, thank you. Thank you, Kenneth. Rebuttal? Thank you. I was struck by one comment, that once Buckley knew about the Vioxx history, we had the duty to contact Kenneth Russell. That's exactly what we did. We sent an amendment to application, two correspondence that says, read this application, make sure it's correct. We did exactly what they said we should have done. And in fact, this is all avoided had he just read it and he breached his duty to read it, now claims estoppel when his hands aren't clean because he didn't read the policy and discover exactly what our underwriting was trying to figure out. Make sure everything is complete. We sent that letter. We did exactly what he just stood here and said we should have done. That's exactly. How else does an innocent insurer protect himself, either from the mistake or the intentional error of an independent producer whom we may be bound by? We have only one means of dealing with that situation. An independent communication saying, read it, make sure it's correct, and then we have coverage. The trial court found that Buckley talked to Bickle and Bickle gave him more information? Only as to the Vioxx. What happened, Buckley ran an MIB. So we did do underwriting, this idea that we didn't do any underwriting. The names come in, we go to a medical index bureau which harvested data from previous insurers. We discover a history of Vioxx and arthritis. We have a business record that says two things. One, per MIB, and then in another note, per agent. Buckley said he never remembered actually having any conversation with Bickle based upon reviewing that business record. He must have. Bickle denies that conversation took place. But even if, and I'm ready to assume that it did take place, what did it trigger? It triggered USLNH to send to Kenneth Russell the written command to read this policy with application attached that's going to be your policy unless you tell us if there's a mistake in there. And we tell him if there's an omission, this could void your coverage. We do the only thing we can do to protect ourselves from this situation, and I believe in the Marion Joy case that we rely upon obviously heavily. We are in accord with their approach. We did have that subsequent independent communication. But you were allowed to ignore the instructions Bickle gave to the insured that he had no kidney problem that he had to report. No, I don't believe that is, I respectfully submit that is not the evidence. The only evidence is that a history was told and written down on a side sheet. But the testimony, as Tom Bickle said, I don't know what the underwriting requirements are, and Kenneth Russell and Mrs. Russell admitted that's what they were told. And they were, well check and see, and that is a disputed fact, but I think the court's finding is only that Bickle was told this prior history. Obviously the carrier didn't get it, but they took those steps to assure they had an application they could act upon. I believe Justice Cook points out contestability clauses are as much for the protection of the consuming public as they are any isolated and specific purchaser of a particular policy. We cannot encourage a game of hide and seek to the insurance industry looking for a medical history. After all, where does USLNH go to learn this guy's prior medical history? The application sent to us didn't identify a single condition or a single doctor. Where do we go get this history? What we did, we went to the only thing available to the industry that disclosed, as did in evidence, the Midwest Tennessee, the prior policy. It had that Vioxx history on there, and that's what we learned from the prior application. So Illinois law says post-claim underwriting is not unlawful. That's the Grant case. There is no public harm here in a contestability. It's as much for public protection. Every damage in this case is a punishment. They had no loss. Everything is a windfall. The Section 155 sanction asks a simple question. Was there a bona fide dispute? For every reason we cited in our brief, there was a bona fide dispute. For the fact they submitted a false proof of claim on this kidney stone, there is a bona fide dispute. Every dollar of recovery is a windfall. They elected a remedy of bankruptcy, which is about one-ninth, this medical bill, of what their actual loss was. They had a mitigated agreement of $14,000. $31,000 of damages that she testified was less than a third of their total cause for bankruptcy. And we respectfully submit that relief request in our brief. Thank you. Thank you. I take the matter under advice of the Standing Committee.